ALBIN, J.,
dissenting.
A property settlement agreement in a divorce action should address the economic consequences of a marriage’s dissolution; it should not contain senseless shackles that deprive a spouse of the right to seek love and companionship. An ex-husband should not be empowered through a property settlement agreement to threaten his ex-wife with the termination of her alimony if she *56 cohabits with another person, when the living arrangement does not change her financial circumstances. Anti-cohabitation clauses unrelated to the economic standing of an ex-spouse should be contrary to public policy because they serve no purpose other than as instruments of oppression.
Marriage, in part, is an economic partnership, and in many cases one spouse may have subordinated her earning potential or career for the greater good of the family and the financial success of the other spouse. Alimony is a right that assures the divorced spouse that she can maintain the lifestyle that she enjoyed while married. Although the right to alimony is available to all ex-spouses, regardless of gender, the reality is that women are overwhelmingly the ones dependent on alimony.
“The private lives of divorced women are no business of the law” when their personal relationships have not enhanced their economic standing. Konzelman v. Konzelman, 158 N.J. 185, 204, 729 A.2d 7 (1999) (O’Hern, J., dissenting). If an ex-husband cannot be constrained from pursuing a loving or romantic relationship, then why should an ex-wife be constrained from pursuing happiness by the hold of an anti-cohabitation clause untethered to changed economic circumstances? It is not enough to say that a contract is a contract when, as here, a provision is contrary to public policy.
The majority’s enforcement of the anti-cohabitation clause in this case will pauperize the ex-wife and probably leave her dependent on public assistance while her ex-husband enjoys the fruits of his affluence made possible by her marital sacrifices. Because I cannot agree to this miscarriage of justice, I respectfully dissent.
I.
Cathleen and David Quinn were married for twenty-two years before their divorce in 2006. During their marriage, they raised two children, a daughter and son, who at the time of the divorce were nineteen and sixteen years old. Cathleen asserted that David “ascended the corporate ladder for twenty years while *57 [Cathleen] was the homemaker taking care of the family.” At the time of the divorce, David earned a salary that exceeded $200,000 a year, while Cathleen earned a little more than $20,000 a year. The minor son continued to live with his mother after his parents’ separation.
Cathleen and David entered into a property settlement agreement that was incorporated into a judgment of divorce. The agreement provided that Cathleen would receive permanent alimony in the amount of approximately $72,000 per year. Additionally, the agreement provided that “alimony shall terminate upon the Wife’s death, the Husband’s death, the Wife’s remarriage, or the Wife’s cohabitation, per case or statutory law, whichever event shall first occur.” (Emphasis added). The agreement did not exact a penalty if David cohabited.
In 2007, Cathleen began a romantic relationship with John Warholak. Although Warholak lived at Cathleen’s home from January 2008 until April 2010, there is no evidence that Warholak financially supported Cathleen. Cathleen’s relationship with War-holak ended shortly after David filed a motion for termination of alimony based on Cathleen’s cohabitation. David, who was earning more than $250,000 per year at the time, did not argue that he could not afford to continue making alimony payments.
The family court conducted a hearing on David’s motion and determined that Cathleen had cohabited for a period of twenty-eight months. The Court ordered that Cathleen pay back the $169,806 in alimony payments that she had received during the cohabitation period and reimburse David for $145,536.74 in attorneys’ fees. The total amount due, $315,342.74, was to be deducted from Cathleen’s continued alimony payments by reducing those payments by one half until the judgment was paid.
The Appellate Division affirmed, and now this Court reverses. The majority holds that Cathleen’s violation of the anti-cohabitation clause required the irrevocable termination of her alimony, backdated to January 2008. The majority affirms the family court’s order that Cathleen is responsible for David’s attorneys’ *58 fees. As a result of the majority’s decision, Cathleen will no longer receive alimony and is obligated to pay David $315,342.74 from her salary of approximately $20,000 per year. The ruling leaves Cathleen destitute and a good candidate for public assistance.[1]
The majority reaches this unjust result by its adherence to the a-contract-is-a-contract doctrine. But a contractual provision that is contrary to public policy is unenforceable. A spouse has no legitimate reason to condition the receipt of alimony on an ex-spouse not cohabiting with someone whom she loves, when the economic circumstances of the ex-spouse remain unchanged. The public interest is not advanced by giving a spouse the ability to control or intrude into the intimate affairs of his ex-spouse. The law should not encourage a spouse to trail or spy on an ex-spouse, or to hire investigators to do so, to gain some unwarranted financial benefit.[2] Nor should a court stand in the way of an ex-spouse pursuing happiness or authorize the forfeiture of alimony earned over many years of marriage, such as in the circumstances presented here.
A brief review of the relevant case law will show how we have reached the current state of our jurisprudence.
II.
“Alimony is an ‘economic right that arises out of the marital relationship and provides the dependent spouse with “a level of *59 support and standard of living generally commensurate with the quality of economic life that existed during the marriage.” ’ ” Quinn v. Quinn, 225 N.J. 34, 48, 137 A.3d 423, 2016 WL 1740662 (2016) (quoting Mani v. Mani, 183 N.J. 70, 80, 869 A.2d 904 (2005)). Alimony is a right earned by a spouse, often by personal sacrifices made so that the other spouse can pursue a career and enhanced earning power. See Mahoney v. Mahoney, 91 N.J. 488, 500-01, 453 A.2d 527 (1982). Alimony can be modified when the economic circumstances of the parties change, see N.J.S.A. 2A:34-23(c), but cannot be extinguished for reasons contrary to public policy, see Petersen v. Petersen, 85 N.J. 638, 642, 646, 428 A.2d 1301 (1981) (indicating that alimony and support agreements between spouses that are unfair and unjust are not enforceable in equity).
In Gayet v. Gayet, 92 N.J. 149, 456 A.2d 102 (1983), this Court held that a husband — ordered to pay alimony as part of a divorce decree — was not entitled to a modification of his alimony merely because his ex-wife cohabited with an individual. Traditionally, “the test for modification of alimony is whether the relationship has reduced the financial needs of the dependent former spouse.” Id. at 150, 456 A.2d 102. The Court adopted an economic-needs test to determine whether an alimony award should be modified as a result of cohabitation. Id. at 153-54, 456 A.2d 102. Thus, a modification of alimony based on changed circumstances for cohabitation is permitted “only if one cohabitant supports or subsidizes the other under circumstances sufficient to entitle the supporting spouse to relief.” Ibid. That approach, the Court concluded, “best balances the interests of personal freedom and economic support and comports with the principles of’ our jurisprudence and statutory law. Id. at 154, 456 A.2d 102. The Court recognized that “[t]he extent of actual economic dependency, not one’s conduct as a cohabitant, must determine the duration of support as well as its amount.” Ibid.
In Konzelman v. Konzelman, 158 N.J. 185, 729 A.2d 7 (1999), the Court took a wrong turn when it concluded that the parties *60 could contract away the fundamental principles animating Gayet The Court in Konzelman enforced a provision in a property settlement agreement that conditioned the receipt of alimony on an ex-wife not cohabiting with an unrelated male. Id. at 191, 203, 729 A.2d 7. The anti-cohabitation clause was upheld despite the absence of any change in the economic circumstances of the ex-wife. Id. at 196, 729 A.2d 7. Anti-cohabitation clauses under Konzelman permit the forfeiture of the right to alimony even if the cohabiting ex-spouse receives no financial support from the person with whom she resides. Ibid.
In a dissent joined by Justice Stein, Justice O’Hern correctly concluded that Konzelman abandoned Gayet’s financial-needs test, encouraged unwarranted interference in the personal affairs of the ex-wife, and exalted the right to contract above public policy. See id. at 204, 209, 729 A.2d 7 (O’Hern, J. dissenting).[3] In explaining the wrongness of the Konzelman decision, Justice O’Hern made the following points. Legitimizing an anti-cohabitation clause untethered to a change in economic circumstances (1) permits a spouse “to exert unjust and inappropriate control over the [alimony] recipient’s personal life”; (2) allows money to be used as a negotiating tool to “buy a woman’s right to choose her companions”; and (3) “force[s] attorneys and parties to bargain over the fair value” of a clause that has no purpose other than “to retain control over the divorced spouse.” Id. at 206-07, 210, 729 A.2d 7.
Justice O’Hern noted that economic need and dependency underpins an alimony obligation. Id. at 208, 729 A.2d 7. He concluded that it was “manifestly unfair to relieve Mr. Konzelman of all alimony obligations based upon Mrs. Konzelman’s choice of companionship with another man,” without requiring him to demonstrate that his ex-wife’s “financial status is any better because of her new relationship.” Id. at 208-09, 729 A.2d 7. He lamented that the majority ruling in Konzelman would result in “tasteless inquiries into the private lives of divorced women.” Id. at 210, 729 A.2d 7. Justice O’Hern observed that enforcement of the anti- *61 cohabitation danse permitted Mr. Konzelman “to reap the benefits of an increased earning capacity built up during the marriage” while “casting [his] partner of twenty-seven years into poverty” for the “sin” of entering into a loving relationship with another man. Id. at 209, 729 A.2d 7.
Justice O’Hern’s discerning dissent spoke to the realities of his day, and our day, and of a court’s obligation not to enforce an unreasonable, unfair, and overbearing provision of a property settlement agreement. Stare decisis is an important doctrine to promote stability in our jurisprudence, but it is not a command to perpetuate the mistakes of the past when the wrongness of a past decision is revealed in the fullness of time. See Lawrence v. Texas, 539 U.S. 558, 577, 123 S.Ct. 2472, 2483, 156 L.Ed.2d 508, 525 (2003).
III.
A.
The family court is a court of equity, and yet the majority approves the use of an anti-cohabitation clause as a means to oppress an ex-spouse. During twenty-two years of marriage, Cathleen contributed to David’s ability to advance his career and increase his earning capacity. No rational public policy is furthered by forcing Cathleen to choose between her right to economic support by her ex-husband and her desire to enter into a meaningful and loving relationship. The majority not only terminates all of Cathleen’s support by ordering a forfeiture of her alimony, but also directs her to pay her affluent husband over $300,000, approximately thirteen times her annual salary. This absurd and ruinous result that pauperizes her is the antithesis of equity.
B.
Although matrimonial agreements are governed by basic contract principles, Pacifico v. Pacifico, 190 N.J. 258, 265-66, 920 A.2d 73 (2007), contractual provisions that are contrary to public *62 policy are unenforceable, Marcinczyk v. State of New Jersey Police Training Comm’n, 203 N.J. 586, 594, 5 A.3d 785 (2010), even when those provisions are contained in a property settlement agreement, Petersen, supra, 85 N.J. at 640, 646, 428 A.2d 1301. In Petersen, we held that a property settlement agreement providing for an automatic escalation of alimony and support payments based on an increase in a husband’s net income would be unenforceable absent a determination that, despite changed circumstances, “the enforcement of those terms would be fair, just and equitable.” Ibid. Additionally, in Giangeruso v. Giangeruso, 310 N.J.Super. 476, 477, 708 A.2d 1232 (Ch.Div.1997), the Chancery Division declared void as against public policy a clause in a property settlement agreement in which the parties stipulated “that the children shall not have any contact with any girlfriend/boyfriend or love interest of the other if the children express reluctance to do so.”
It is clear that the right to contract does not reign supreme in family matters and that the greater good must prevail over the schemes and designs of a party or parties when a contractual provision offends public policy. The family court, in particular, is invested with equitable powers to ensure that individual rights are not trampled by oppressive contractual clauses that serve no legitimate purpose. See Petersen, supra, 85 N.J. at 644-46, 428 A.2d 1301. Among the “unalienable rights” guaranteed in the first article and paragraph of the New Jersey Constitution is the right to pursue “happiness.” N.J. Const, art. I, ¶ 1. The contractual provision in this case empowers an ex-husband to compel his former wife to choose between continuing a loving relationship and maintaining her earned right to alimony, even when her new relationship has not changed her economic circumstances.
The hardship and unfairness caused by today’s decision will be disproportionately borne by divorced women who, by an overwhelming number compared to men, are dependent on alimony for their support.[4]
*63 C.
Finally, the majority errs in suggesting that cohabitation and marriage are or should be equivalent under the law. See Quinn, supra, 225 N.J. at 53-54, 137 A.3d 423. Marriage is more than a solemn exchange of vows. The law confers on married couples— not cohabiting partners — considerable economic and other benefits. See, e.g., N.J.S.A. 2A:84A-22 (marital privilege limited to spouse or civil union partner); N.J.S.A. 3B:5-3 (spouse eligible for share of intestate estate); N.J.S.A. 3B:5-15 (spouse or domestic partner has right to intestate share of decedent’s estate when decedent’s will written before marriage or domestic partnership); N.J.S.A. 3B:8-1 (only surviving spouses and domestic partners qualify for right to elective share of decedent’s estate); N.J.S.A. 18A:62-25 (spouse of member of New Jersey National Guard killed while performing duties eligible for post-secondary education tuition benefits); N.J.S.A. 18A:71-78.1 (spouse of volunteer firefighter eligible for post-secondary education tuition benefits); N.J.S.A. 34:11^4.5 (wages due to deceased employee may be paid to spouse); N.J.S.A 34:llB-3(j) (defining family member as “a child, parent, spouse, or one partner in a civil union couple” for purposes of Family Leave Act); N.J.S.A. 34:15-13 (spouse of deceased eligible for death benefits under workers compensation law); N.J.S.A. 46:3-17.2 (spouses may hold property by tenancy by entirety); N.J.S.A 46:15-10 (spouses exempt from realty transfer fee); N.J.S.A. 54A:2-l(a) (determination of taxable income affected by marital status); N.J.S.A 54A:3-3 (spouse’s medical expenses may be partially deducted from taxable gross income). Cf. United States v. Windsor, — U.S. —, —, 133 *64 S.Ct. 2675, 2694, 186 L.Ed.2d 808, 828-29 (2013) (noting that married couples are entitled to specific government healthcare benefits, to special protections for domestic-support obligations under the Bankruptcy Code, and to file their state and federal taxes jointly).
Additionally, by its recent amendments to the alimony statute, N.J.S.A. 2A:34-23, the Legislature has signaled that it did not intend to conflate cohabitation with marriage. The new statute provides that “[ajlimony may be suspended or terminated if the payee cohabits with another person.” N.J.S.A. 2A:34-23(n) (emphasis added). In contrast, when “a former spouse shall remarry ... permanent and limited duration alimony shall terminate as of the date of remarriage.” N.J.S.A. 2A:34-25 (emphasis added).
The permissive language in N.J.S.A. 2A:34-23(n) — unlike the mandatory language in N.J.S.A. 2A:34-25 — indicates that the Legislature did not intend alimony to terminate, or even be modified, automatically in the event of cohabitation. The permissive language requires our family courts to equitably exercise discretion. In doing so, undoubtedly, in the absence of a property settlement agreement, our courts will look to the guiding principles of Gayet’s economic-needs test. Clearly, the Legislature intended courts to treat marriage and cohabitation differently in determining when to terminate or modify alimony.
IV.
The majority in this case has reached not the inevitable, but the inequitable result. The majority’s adherence to Konzelman has led to an unjust outcome in this case. We are not bound to follow a decision whose principles are unsound and when considered reflection counsels that we should take a different, more just course. The passage of time has not dimmed the logical force of Justice O’Hern’s dissent in Konzelman. Denying a divorced woman her right to alimony merely because she has pursued happiness and cohabits advances no legitimate interest when her economic circumstances remain unchanged. The wrong here is *65 not made right because the anti-cohabitation clause is contained in a property settlement agreement.
I would hold that an anti-cohabitation clause, untethered to economic needs, is contrary to public policy and unenforceable. I therefore respectfully dissent.
For reversal — Chief Justice RABNER, and Justices PATTERSON, SOLOMON, and Judge CUFF (temporarily assigned) — 4.
For dissent — Justices LaVECCHIA and ALBIN — 2.
Not Participating — Justice FERNANDEZ-VINA.

 While the poverty level for a single individual is $11,880 per year, see Federal Poverty Level, HealthCare.gov, https://www.healthcare.gov/glossaiy/federal-poverty-level-FPL/, New Jersey residents may for example, qualify for supplemental nutritional assistance at an income of $21,978, see General Assistance (WorkFirst NJ), State of New Jersey, Department of Human Seivices, Division of Family Development, http://www.state.nj.us/humanservices/dfd/programs/ assistance/.

 In Konzelman, supra, a private investigator watched a "residence seven days a week for 127 days” to determine whether a divorced wife cohabited with an unrelated male. 158 N.J. at 191, 729 A.2d 7.

 Justice O'Hern authored Gayet.

 According to the United States Census Bureau, in the 2010 census, of the 392,000 people in the nation who listed alimony as a source of income, 380,000 *63 were women. See Current Population Survey, Source of Income in 2010 — Number with Income and Mean Income of Specified Type in 2010 of People 15 Years Old and Over by Age, Race, and Hispanic Origin, and Sex, Both Sexes, http://www. census.gov/hhes/www/cpstables/03201 l/perinc/new09_001 .htm; Current Population Survey, Source of Income in 2010 — Number with Income and Mean Income of Specified Type in 2010 of People 15 Years Old and Over by Age, Race, and Hispanic Origin, and Sex, Females, http://www.census.gov/hhes/www/cpstables/ 03201 l/perinc/new09~013.htm.